Filed 1/29/25  P. v. Carrillo CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FERNANDO CARRILLO,<br><br>    Defendant and Appellant. | A168626<br><br><br>(Solano County<br>Super. Ct. No. FC29528) |

Defendant Fernando Carrillo appeals from the trial court's order extending his civil commitment at Patton State Hospital, pursuant to Penal Code section 1026.5.[1]  He contends that substantial evidence did not support the recommitment order and, upon reversal, the petition to extend commitment should be dismissed because double jeopardy and res judicata principles apply when a recommitment order is dismissed for insufficient evidence.  Carrillo additionally contends the recommitment order should be reversed because he did not voluntarily waive his right to a jury trial.

We reverse because the record does not affirmatively demonstrate that Carrillo's waiver of his right to a jury trial was voluntary and intelligent.

---

[1]  All undesignated statutory references are to the Penal Code.

1

Further, in light of Carrillo's claim that the lack of substantial evidence supporting the extension of his commitment precludes a retrial under double jeopardy or res judicata principles, we will address his substantial evidence challenge. We conclude there was substantial evidence to support the extension of his commitment.

## BACKGROUND

### I.

### *The Criminal Proceedings and Recommitment Petition*

In 1991, Carrillo was committed to Atascadero State Hospital for a maximum term of six years after being found not guilty by reason of insanity (NGI) relative to his assault of three correctional officers while he was serving a separate sentence for attempted rape. Carrillo was later transferred to Patton State Hospital.

From 1996 to 1999, Carrillo was treated in community outreach through the Los Angeles County Conditional Release Program (CONREP). However, in March 1999, Carrillo was remanded back to the state hospital when he asked a female passenger on a public bus for her phone number and then later touched the breast of a female staff member who was supervising him.

Thereafter, the trial court extended Carrillo's commitment numerous times pursuant to section 1026.5.

In April 2022, the People filed the petition to extend Carrillo's commitment under section 1026.5 that is at issue in the present appeal. In support of the petition, the People submitted a February 2022 written report by Dr. Troy Freimuth, a Senior Psychologist Specialist (Forensic) at Patton State Hospital.

2

## II.

### *Dr. Freimuth's Written Report*

Dr. Freimuth began his February 2022 report by detailing the original offense that led to Carrillo's commitment in a state hospital and the later offense that formed the basis of his current commitment. In the original offense, which occurred in 1985, Carrillo followed his female victim down the street before masturbating and propositioning her for sex. When she did not comply, he tore her blouse and bra and sexually assaulted her. Carrillo ran from the scene when the victim screamed for help. He was later charged and convicted of attempted rape. While serving his prison term for that offense, Carrillo physically assaulted three female correctional officers at the Vacaville Medical Facility when they denied him entry into a day room; this was the offense that led to his current commitment.

During his commitment, Dr. Freimuth noted that though Carrillo was conditionally released and treated in CONREP between 1996 and 1999, he was remanded back to the state hospital after he inappropriately touched a female staff member.

The report went on to list Carrillo's diagnoses, which include schizophrenia, various substance abuse disorders and borderline intellectual functioning. It also indicated that past symptoms of Carrillo's schizophrenia included "auditory hallucinations," such as "hearing voices that told him people were out to get him" or that "instructed him to rape women and to have sex with them."

A psychiatric note from the month before Dr. Freimuth wrote his report indicated that Carrillo continued to be " 'preoccupied' " with " 'having a woman as a romantic companion/wife in the future' " and that he " 'continue[d] to focus on having sex' " and " 'look[ed] at female staff

3

inappropriately.' " Further, during an interview with a female psychologist for his September 2021 court report, Carrillo engaged in behavior that could have been construed as problematic—namely, asking to sit closer to the evaluator based on claims of a hearing disorder and then asking to go to the bathroom and not returning for over 10 minutes. Prior to that, a March 2021 CONREP evaluation stated that Carrillo continued to engage in " 'inappropriate behaviors toward female staff and with a female peer.' "

The report also indicated that Carrillo continued to suffer from auditory hallucinations. In fact, during the February 2022 interview Dr. Freimuth had with Carrillo before drafting his report, Carrillo reported periodically hearing the voices of family members though he seemed unsure if these voices were a symptom of his mental illness. Further, Carrillo did not seem to understand the role his mental illness played in the commission of his past offenses; more particularly, Carrillo was only able to describe his actions and was less able to articulate what symptoms he was having during the offenses apart from stating that he was hearing voices and was feeling " 'confused' " and " 'paranoid.' " Dr. Freimuth concluded that Carrillo was unable to clearly identify triggers or early warning signs for a relapse of his mental illness.

When asked about his future treatment needs, Carrillo failed to appreciate the important role medication played in helping to manage and reduce his psychotic symptoms. For example, Carrillo stated he would " 'probably' " need medication once released but continued to focus on hoping that the dosage would be lowered. Dr. Freimuth also cited a June 2021 psychological risk review wherein Carrillo expressed his belief he could manage his mental illness outside of the state hospital through a good sleep routine and avoiding too much caffeine. Lastly and most significantly,

Dr. Freimuth noted that Carrillo had reported that he "ha[d] not consistently complied with taking his psychotropic medication when he was living in the community."

Based on the foregoing, Dr. Freimuth concluded that Carrillo "remains a danger related to his mental illness, and he would have serious difficulty controlling his behavior, due to ongoing symptoms (auditory hallucinations) and a sexual preoccupation, similar to his mental state at the time he committed his sexual assault." Dr. Freimuth noted that in the highly secure, supervised setting of the state hospital, Carrillo is able to "limit his behavior to just inappropriately staring at female staff members and, up until recently, inappropriately touching a transexual peer." However, Dr. Freimuth expressed concern that in a community setting "where he does not have trusted staff around 24/7 to remind him to stop staring at the females or to stop touching his transexual peer inappropriately," Carrillo's risk for sexual assault and potential violence would "increase substantially." This was particularly the case given that Carrillo was "ambivalent" about whether he would continue taking his medication and "likely . . . would not agree to medication adjustments to manage his increased symptomatology" thereby increasing his risk.

## III.

### *Jury Trial Waiver*

In August 2022, the trial court conducted a trial readiness conference, which Carrillo attended remotely. At the conference, Carrillo's counsel confirmed a jury trial but also requested additional time to speak with Carrillo about a section 1026.2 petition,[2] stating that it could affect the trial

---

[2] Section 1026.2 allows a person committed to a state hospital after pleading NGI to petition the court for release based on restoration of sanity.

on the People's petition to extend commitment. Counsel then asked if the court was allowing individuals at the state hospital to appear remotely for jury trials, and the court responded: "I mean, if you get a waiver from him, I think I would permit that." Nonetheless, the court and the parties also discussed obtaining a removal order that would enable Carrillo to be present for the trial in September, which could be cancelled if it turned out to be unnecessary.

Two weeks later, the trial court conducted another trial readiness conference, which Carrillo attended remotely. Carrillo's counsel asked for and the court agreed to a few more days so counsel could discuss with Carrillo whether he wanted to have a court trial or a jury trial.

In September 2022, the trial court held a trial readiness conference, which Carrillo attended remotely. Carrillo's counsel stated she spoke with Carrillo about whether he wanted a court or jury trial, and "believe[d]" he was going to waive a jury trial. The following colloquy ensued:

"MS. EVANS: Good morning. So Mr. Carrillo, I'm going to first explain to you your right to have a jury trial. Okay?

"THE DEFENDANT: Okay.

"MS. EVANS: So in this matter, you do have a right to have a jury trial where you would help me pick twelve people from the community that would come into court and hear all the evidence in the case. And it would be those twelve jurors who would decide whether or not the District Attorney has proven beyond a reasonable doubt that you have a mental disorder, and that because of that mental disorder you

6

currently represent a substantial danger of physical harm to others, keeping in mind your commitment would not be extended unless all twelve jurors agree the District Attorney has met their burden of proof of beyond a reasonable doubt. Do you understand your right to have a jury trial?

"THE DEFENDANT: Yes, Your Honor. I mean, yes, Ms. Evans, definitely.

"MS. EVANS: I'm sorry, Mr. Carrillo, do you understand your right to have a jury trial?

"THE DEFENDANT: Yes. I understand my right to a jury trial. I want to ask you if I was to go over there in Solano county or—how will I stay in a cell?

"MS. EVANS: I don't have an answer to that, Mr.—

"THE DEFENDANT: Okay. Okay. It's okay. Thank you, Tiffany. Yes, I understand my rights, Tiffany.

"MS. EVANS: So having understood your rights to a jury trial, do you wish to waive the right and proceed with a court trial where the judge will hear all the evidence and decide whether or not the District Attorney has proved their case beyond a reasonable doubt?

"THE DEFENDANT: I couldn't understand you.

7

"MS. EVANS: Okay. First of all, Mr. Carrillo, do you want to come to Solano county and have a jury trial?

"THE DEFENDANT: No. No, I mean—

"MS. EVANS: Okay. So you're telling us you don't want to come to have a jury trial. Do you want to proceed and have a court trial where you can appear on video?

"THE DEFENDANT: Yes.

"MS. EVANS: Okay.

"THE DEFENDANT: Yes. Right now I'm living—

"MS. EVANS: Mr. Carrillo, do you understand that with a court trial you'll appear on video, and the judge will hear all the evidence in the case, and the judge will decide whether or not your commitment should be extended?

"THE DEFENDANT: Okay, yes.

"MS. EVANS: Do you understand that?

"THE DEFENDANT: Yes. Yes, if I went to court I be extended again.

8

"MS. EVANS: Okay. So you want to have a court trial, correct?

"THE DEFENDANT: Court trial, yes.

"THE COURT: All right. And would you join in that?

"MS. EVANS: Yes, Your Honor.

"THE COURT: Okay. So I'll make a finding the defendant's waived his right to a jury trial. We'll instead hold a court trial."

## IV.

### *The Court Trial*

The court trial was set for October 2022 but was then continued a few times to July 2023. During the one-day trial, the People presented two witnesses: (1) Dr. Kevin Quinonez-Truong, and (2) Dr. Freimuth.

**A. Dr. Quinonez-Truong's Testimony**

Dr. Quinonez-Truong worked as a contract psychiatrist at Patton State Hospital and was meeting with Carrillo monthly. In the few months before the recommitment hearing, the two were meeting almost weekly as Carrillo would reach out to Dr. Quinonez-Truong to go over homework from groups he was a part of and to discuss his symptoms. Among other things, Dr. Quinonez-Truong testified that Carrillo regularly discussed his paranoid feelings that the medication he was taking or the food he was eating in public restaurants was poisoning him and disrupting his sexual abilities. Carrillo also mentioned ongoing auditory hallucinations wherein he would hear family members saying his name.

Further, in the few weeks leading up to the trial, Dr. Quinonez-Truong

9

had observed an increase in Carrillo's symptoms, including heightened paranoia that he was being poisoned by his medications, and a "hypersexuality" that included increasing references to "sexual delusions" whereby Carrillo felt like he wanted to have relationships with several of the female staff members once released, wanted them to touch him, and believed that they also wanted to have a relationship with him. Carrillo also reported that he was masturbating in his room several times a day when imagining these staff members and failed to realize the inappropriate nature of these sexual fantasies and behaviors.

Due to the increase in Carrillo's symptoms, Dr. Quinonez-Truong increased Carrillo's medication dosage but expressed concerns about whether Carrillo would stop taking his medication once released in the community.

**B. Dr. Freimuth's Testimony**

Dr. Freimuth testified that Carrillo suffered from schizophrenia and that he continued to experience symptoms such as auditory hallucinations, though it was unclear to Carrillo himself that these were a symptom of his mental illness. As for the offenses that resulted in his commitment (i.e. the attempted rape and the later assault on three female correctional officers), Carrillo had difficulty explaining what was going through his mind when those offenses occurred, though he did say he was hearing voices or feeling paranoid. Carrillo also did not understand the connection between symptoms he was experiencing and how those could make him dangerous. For example, Carrillo did not appreciate the fact that hearing voices contributed to the offenses he had committed.

Dr. Freimuth concluded that Carrillo only had "partial insight" into his illness in that he understood he had a mental illness but did "not fully

10

understand the severity and clonicity"[3] of the illness.  For example, Carrillo understood that he could be paranoid but did not understand that his belief around his medications poisoning him was a paranoid belief.  Carrillo also believed his mental illness was caused by being poisoned when he goes out to eat and therefore concluded that avoiding restaurants would help keep him mentally well.  This is despite the fact he acknowledged, when questioned, that he was not taking his medication when he assaulted the correctional officers.

Dr. Freimuth therefore expressed concern about Carrillo's ability to monitor and be aware of his symptoms once released in the community. Dr. Freimuth also said there was a danger Carrillo would stop taking his medication given his belief his medication was poisoning him or affecting his sexual functioning, and his fixation with lowering the dosage.  Dr. Freimuth's concerns regarding the danger Carrillo posed to others were amplified by the fact Carrillo had a "very high-level of sex drive or sexual preoccupation" and had engaged in multiple instances of inappropriate behavior over the years.

Based on the foregoing, Dr. Freimuth opined that Carrillo had serious difficulty controlling his dangerous behavior and continued to pose a substantial danger of physical harm to others.

**C. Carrillo's Argument**

Carrillo's counsel did not present any additional witnesses but did

---

[3] It is unclear why Dr. Freimuth used the word "clonicity," which has to do with clonus, a neurological condition producing rapid muscle contractions. (See Merriam-Webster Dict. <https://www.merriam-webster.com/medical/clonic> [as of Jan. 28, 2025]; Cleveland Clinic <https://my.clevelandclinic.org/health/symptoms/24822-clonus> [as of Jan. 28, 2025].)  It seems possible the word he said or intended to say was "chronicity," meaning that Carrillo did not understand that his symptoms and his disease are chronic.

cross-examine both Dr. Quinonez-Truong and Dr. Freimuth.

During the cross-examinations, both doctors confirmed that Carrillo had not engaged in any recent acts of "physical aggression," had been consistent in taking his medication, and had stated that he needed to continue taking medication even after his release to prevent decompensation. Counsel also asked both doctors to confirm that, on rare occasions, the medication Carrillo was taking could result in erectile dysfunction or an inability to achieve an orgasm, and the doctors stated this was the case.

Further, Dr. Quinonez-Truong agreed that the voices Carrillo was hearing had not been commanding him to hurt anybody but were just the voices of his family members saying his name or saying encouraging things. Dr. Freimuth confirmed that Carrillo had been diagnosed with borderline intellectual functioning which makes it more challenging for Carrillo to have an in-depth understanding of his mental illness.

In her closing argument, Carrillo's counsel acknowledged that Carrillo had a mental illness. However, counsel contended that Carrillo did not pose a substantial danger of physical harm to others because there had been "no incidents of physical aggression, verbal threats or damage to state property." Counsel also asserted Carrillo's worries about his medication affecting his sexual functioning were "logical" because both doctors testified on cross-examination that some psychotropic medications can affect an individual's sex drive or ability to have an erection or orgasm. In any event, counsel pointed out that Carrillo told both doctors that he would continue taking his medication once released. Counsel also argued that the recent increase in Carrillo's symptoms could have been attributed to the stress of the upcoming trial.

As for Carrillo's masturbation in his bedroom, counsel framed it as the

usage of a "coping skill[]" and argued it indicated that Carrillo was *not* dangerous to others because he was "removing himself from any situation" and handling his thoughts in a "healthy way . . . without presenting himself." She also asserted this behavior merely evidenced a desire for "human connection" but did not mean that Carrillo was dangerous. Lastly, with respect to Carrillo's auditory hallucinations, counsel pointed out Carrillo was just hearing the voices of his family members saying his name and not voices that were telling him to commit acts of aggression; thus, she asserted it was "hard to see" the connection between the hallucinations and any future dangerousness especially given that there had been no recent acts of physical aggression by Carrillo.

### D. Trial Court Decision

The trial court ultimately found the People had proved beyond a reasonable doubt that Carrillo continued to represent a substantial danger of physical harm to others and extended his commitment.

**DISCUSSION**

**I.**

***Carrillo's Waiver of a Jury Trial Was Invalid.***

Section 1026.5, subdivision (b)(4) provides in relevant part that the trial on a petition to extend commitment "shall be by jury unless waived by both the person and the prosecuting attorney." "[A] defendant's waiver of the right to jury trial may not be accepted by the court unless it is knowing and intelligent, that is, ' " 'made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it,' " ' as well as voluntary ' " 'in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.' " ' " (*People v. Collins* (2001) 26 Cal.4th 297, 305 (*Collins*).)

13

There is no "specific method for determining whether a defendant has made a knowing and intelligent waiver of a jury trial in favor of a bench trial." (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 167.) Instead, we "examine the totality of the circumstances" (*ibid.*) and find a waiver valid only " 'if the record affirmatively shows that it is voluntary and intelligent under the totality of the circumstances' " (*Collins, supra*, 26 Cal.4th at p. 310). "The voluntariness of a waiver is a question of law which we review de novo." (*People v. Vargas* (1993) 13 Cal.App.4th 1653, 1660.)

Here, Carrillo asserts the record does not affirmatively demonstrate his waiver of a jury trial was knowing, intelligent and voluntary. Rather, he contends the colloquy that preceded his waiver of a jury trial at the September 2022 trial readiness conference implicitly conditioned his ability to appear remotely at trial on a waiver of his right to a jury trial. As such, Carrillo argues the circumstances surrounding his waiver were similar to those in *Collins*, where the trial court suggested defendant might receive a benefit if he waived his right to a jury trial and the California Supreme Court held this inducement violated defendant's right to due process and rendered the waiver involuntary. (See *Collins, supra,* 26 Cal.4th at pp. 309, 312.) Carrillo's argument is well-taken.

In *Collins*, when discussing whether defendant would waive his right to a jury trial, the trial court informed defense counsel that not taking two weeks' time to try the case " 'has some effect on the court.' " (*Collins, supra,* 26 Cal.4th at p. 309.) The court then went on to say: " '*I didn't specify and I'm not specifying that there's any particular benefit, but that by waiving jury, you are getting some benefit, but I can't tell you what that is because I don't know yet. Understood?*' " (*Id.* at p. 302.) The defendant stated he understood and proceeded to waive a jury trial. (*Id.* at pp. 302–303.) The high court held

14

that the defendant's waiver was involuntary because the trial court's "negotiation" presented a " 'substantial danger of unintentional coercion.' " (*Id*. at p. 309.)

The record here similarly indicates that Carrillo's waiver of his right to a jury trial was not knowing, intelligent and voluntary as it may have been based on his belief he could only gain the benefit of a remote appearance at trial if he waived his right to a jury. From the beginning, the record indicates that Carrillo may have been concerned about having to appear in person for a trial but, up until the end, never clearly understood that remote appearances were a possibility for both jury trials and court trials.

For example, during the first trial readiness conference in August 2022, Carrillo's counsel asked the trial court if it was allowing individuals at state hospitals to appear remotely for jury trials, to which the court responded that it would probably permit that. Carrillo's counsel then represented at the September 2022 trial readiness conference that she had spoken with Carrillo about his options between a court or jury trial. Notwithstanding this fact, during the waiver colloquy that followed, Carrillo seemed to link a jury trial with an in person appearance. Notably, when asked if he understood his right to a jury trial, Carrillo responded: "Yes. I understand my right to a jury trial. I want to ask you if I was to go over there in Solano county or— how will I stay in a cell?"

Carrillo's counsel's response did not clear up this ambiguity, as she first stated, "I don't have an answer to that" before the following dialogue occurred:

> "MS. EVANS: So having understood your rights to a jury trial, do you
> wish to waive the right and proceed with a court trial where the judge

will hear all the evidence and decide whether or not the District Attorney has proved their case beyond a reasonable doubt?

"THE DEFENDANT: I couldn't understand you.

"MS. EVANS: Okay. First of all, Mr. Carrillo, do you want to *come to Solano county and have a jury trial*?

"THE DEFENDANT: No. No, I mean—

"MS. EVANS: Okay. So you're telling us you don't want to *come to have a jury trial*. Do you want to proceed and have a *court trial where you can appear on video*?

"THE DEFENDANT: Yes.

"MS. EVANS: Okay.

"THE DEFENDANT: Yes. Right now I'm living—

"MS. EVANS: Mr. Carrillo, do you understand that *with a court trial you'll appear on video*, and the judge will hear all the evidence in the case, and the judge will decide whether or not your commitment should be extended?"

(Italics added.)

In framing her questions this way, Carrillo's counsel appeared to suggest

16

twice that Carrillo would have to "come" to Solano County if he wanted a jury trial but could "appear on video" with a court trial.

Compounding this ambiguity was the additional fact Carrillo may also have believed that going to court would result in an extension of his commitment. Specifically, after Carrillo's counsel asked if he understood that having a court trial would mean a judge would decide whether to extend his commitment, Carrillo responded: "Yes. Yes, if I went to court I be extended again." Counsel then confirmed Carrillo wanted a court trial and Carrillo said, "Court trial, yes."

Taking these things together and considering the totality of the circumstances, including the fact Carrillo has been diagnosed with borderline intellectual functioning, we conclude the record does not affirmatively demonstrate Carrillo's waiver of a jury trial was voluntary and intelligent. Rather, the record suggests Carrillo's waiver may have been based on a misunderstanding that he could only obtain the benefit of a remote appearance at trial if he waived his right to a jury.

## II.

### *Substantial Evidence Supports the Extension of Commitment Decision.*

Under section 1026.5, the commitment of a person found not guilty by reason of insanity can be extended "only if the person has been committed under Section 1026 for a felony and by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others." (§ 1026.5, subd. (b)(1).) The last element "requires proof that the person has serious difficulty controlling his dangerous behavior." (*People v. Williams* (2015) 242 Cal.App.4th 861, 872.)

We review an order to extend a commitment under section 1026.5 for substantial evidence. (*People v. Williams*, *supra*, 242 Cal.App.4th at p. 872.)

17

Under that test, we "examin[e] the entire record in the light most favorable to the order to determine whether a rational trier of fact could have found the requirements of the statute satisfied beyond a reasonable doubt." (*Ibid.*) "A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment under section 1026.5." (*People v. Bowers* (2006) 145 Cal.App.4th 870, 879.) However, " 'expert medical opinion evidence that is based upon a " 'guess, surmise or conjecture, rather than relevant, probative facts, cannot constitute substantial evidence.' " [Citations.]' " (*People v. Redus* (2020) 54 Cal.App.5th 998, 1011.)

In the case before us, Carrillo does not dispute the fact he has a mental disorder. But he asserts there was insufficient evidence for the trial court to find that he has serious difficulty controlling his dangerous behavior such that there is a substantial danger of physical harm to others. We conclude substantial evidence supports the trial court's finding and decision to extend Carrillo's commitment.

Dr. Quinonez-Truong testified that in the weeks leading up to the trial, Carrillo was experiencing an increase in symptoms including a "very high-level of sex drive," sexual delusions and ongoing sexual preoccupations whereby he wanted to have relationships with several of the female staff members at the state hospital and believed they also wanted to have relationships with him. Carrillo was also engaging in sexually improper behaviors such as looking at female staff inappropriately, masturbating several times a day when imagining them, and inappropriately touching a transexual peer. Thus, Dr. Freimuth noted in his written report that although Carrillo was able to "limit his behavior to just inappropriately staring at female staff members" in the setting of a highly secure, supervised

18

state hospital, Carrillo's risk for sexual assault and potential violence would "increase substantially" in a community setting where he "does not have trusted staff around 24/7 to remind him to stop staring at the females or to stop touching his transexual peer inappropriately."

Further, Carrillo was continuing to suffer from auditory hallucinations—a symptom of his mental illness that existed at the time he committed his original offenses of attempted rape and assault upon the three female correctional officers. He also seemed to have difficulty understanding that these voices were a symptom of his mental illness, did not appreciate that hearing voices contributed to his prior offenses, and failed to understand the triggers or early warning signs for relapse of his illness.

Finally, the risk of Carrillo not being able to control his potentially dangerous behavior was compounded by evidence in the record indicating it was likely he would stop taking his medication once released in the community. Both doctors testified that Carrillo was suffering from paranoia that he was being poisoned by his medication or that it was affecting his sexual functioning. Carrillo also ambivalently stated that he would " 'probably' " need medication but was more focused on reducing the dosage while expressing a belief his mental illness could be managed through avoiding public restaurants, a good sleep routine and avoiding too much caffeine. Further, there was evidence that Carrillo had *not* consistently taken his medication when living in the community. All these factors are of particular concern because Carrillo was not taking his medication when he committed one of his prior offenses.

Carrillo contends that the last time he inappropriately touched a staff member was while he was out on CONREP in 1999 and cites cases in which recommitment orders were reversed where there was no evidence the

19

defendants had engaged in dangerous behavior for decades even despite lapses in medication. Carrillo argues the evidence fails to demonstrate he will have serious difficulty controlling his dangerous behavior as he has only been masturbating in the privacy of his own room and has been respectful in his interactions with female staff. Thus, Carrillo asserts that despite his increased symptoms, he did not act out in an aggressive way; in fact, he reached out to Dr. Quinonez-Truong to discuss his symptoms.

Carrillo's arguments do not persuade us. Significantly, despite his contention that he was not "aggressive," Carrillo fails to address the evidence in the record that he continued to engage in other forms of inappropriate behavior such as staring inappropriately at female staff members and, until recently, touching a transexual peer. He also glosses over the fact that he continues to experience the same symptoms of his illness (i.e. auditory hallucinations) that he admitted led to the offenses that resulted in his commitment. Lastly, Carrillo does not address his prior failure to take medication when in the community, which is of particular concern given the correlation between his failure to take his medication and his commission of at least one of his prior offenses. As such, Carrillo's situation is distinguishable from those in the cases he relies on. (See, e.g., *People v. Redus, supra*, 54 Cal.App.5th at p. 1012 [no evidence of dangerous behavior over multiple decades even through CONREP releases and medication lapses], *People v. Cheatham* (2022) 82 Cal.App.5th 782, 785, 792 [defendant had not engaged in any violent behavior and had been committed because he fled from criminal custody twice after he heard voices tell him his life was in danger]; *People v. Johnson* (2020) 55 Cal.App.5th 96, 109 [no incidents of violence or aggression while under CONREP supervision despite fact he stopped taking medication for two months].)

20

We therefore conclude substantial evidence supports the trial court's finding that Carrillo had serious difficulty controlling his dangerous behavior and represented a substantial danger of physical harm to others. Accordingly, we need not reach Carrillo's contention that the petition to extend commitment should be dismissed because double jeopardy or res judicata applies when a recommitment order is reversed for insufficient evidence.

## DISPOSITION

The trial court order extending Carrillo's commitment is reversed, and the case is remanded for retrial at the option of the People.[4]

---

[4] This court is aware that a new petition has been filed and a jury trial has been scheduled for January 28, 2025.

_____
STEWART, P. J.

We concur.


_____
RICHMAN, J.


_____
MILLER, J.


*People v. Carrillo* (A168626)


22